IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LOUISIANA INTERNATIONAL | § | |
| MARINE, L.L.C. | § | |
| | § | |
| v. | § | C.A. NO. C-11-186 |
| | § | |
| The Drilling Rig ATLAS CENTURY, | § | Admiralty Fed. R. Civ. P. 9(h) |
| *and her engines, tackle, apparel,* | § | |
| *appurtenances, etc., in rem, and* | § | |
| KTM SERVICES, INC., *in personam* | § | |

**MEMORANDUM AND RECOMMENDATION TO
GRANT IN PART AND DENY IN PART THE MOTION TO DISMISS**

This is an admiralty action filed pursuant to Supplemental Rule C of the Federal Rules of

Civil Procedure.  Pending is a Motion to Vacate Arrest and Motion to Dismiss In Rem Claims

for Lack of Subject Matter Jurisdiction by Bayfront Consulting, LLC ("Bayfront") and Basic

Energy, Ltd. ("Basic"), challenging the power of this Court to properly adjudicate this action.

(D.E. 89).  Responses opposing dismissal were filed by Plaintiff Louisiana International Marine,

L.L.C., (D.E. 91), as well as intervenors International Divers Co., Inc. d/b/a Best Bet Line

Handlers ("Best Bet"), (D.E. 92), GAC Shipping (USA), Inc. ("GAC"), (D.E. 93), Kiewit

Offshore Services, Ltd. ("Kiewit"), (D.E. 95), and COSCO Shipping, Co., Ltd. ("COSCO").

(D.E. 96).  Intervenors Seabulk Towing Services, Inc. ("Seabulk") and Signet Maritime Corp.

("Signet") jointly submitted their response opposing the motion to dismiss.  (D.E. 90).  A reply

was filed by Bayfront and Basic.  (D.E. 99).  For the reasons stated herein, it is respectfully

recommended that this motion to dismiss be granted in part and denied in part.

**I.  BACKGROUND**

This dispute involves a number of contracts providing Defendant KTM Services, Inc.

("KTM") with financing and transport services relating to the semi-submersible drilling rig Atlas

Century.  The Atlas Century was constructed around 1973 under the name "Ocean Century" by Diamond Offshore Drilling, Inc. ("Diamond").  (D.E. 89, at 4).  Diamond removed the rig from service in July 1998 and "cold-stacked"[1] it in the Gulf of Mexico without any intent to return it to active service as an offshore drilling unit.  (D.E. 89-1, at 1-2).  In 2003, the rig was sold to Viking Offshore (USA), Inc. and renamed "Viking Century."  (D.E. 89, at 4).

After an intervening change in ownership, KTM Limited purchased the "Viking Century" from Viking Century Liquidating Trust on September 30, 2010.  (D.E. 89-3, at 1-2).  Shortly thereafter, Defendant KTM acquired the rig from KTM Limited on October 8, 2010.  (D.E. 89-4, at 1-2).  This transaction was facilitated by the financial backing of both Bayfront and Basic.  In a Secured Loan Agreement dated September 30, 2010, they agreed to provide Defendant KTM $350,000 "to assist [KTM] in the purchase of a decommissioned oil rig ... which [KTM] will dismantle and sell for scrap value."  (D.E. 89-6, at 1-4).

However, the Atlas Century was never fully scrapped.  From around April 1, 2011 until it was seized, Defendant KTM entered into various contracts for the transportation of the Atlas Century out of Sabine Pass, Texas.  On or around April 1, 2011, KTM contracted with GAC to serve as the general shipping agent to coordinate the Atlas Century's transportation to Kiewit's facility in Ingleside, Texas.  (D.E. 11, at 2; D.E. 78-1, at 2).  On behalf of KTM, GAC contracted with Seabulk and Signet for the provision of tug and barge services associated with the drilling rig's transportation.  (D.E. 32, at 2; D.E. 57, at 2; D.E. 90-1, at 1).  Plaintiff also agreed to

---

[1] The term cold-stacking is industry jargon referring to the status of an inactive oil rig.  Cold-stacking is "similar to 'shuttering' an industrial plant - workers are let go, the hatches are battened down and the rig is completely shut down. ... [R]igs that are cold stacked are typically out of service for a significant period of time and are generally not considered to be part of marketable supply."  Rigzone, Offshore Rig Status Descriptions, http://rigzone.com/data/rig_statusdescriptions.asp.

2

provide towing services for the drilling rig on April 1, 2011.  (D.E. 1, at 2; D.E. 2-1, at 1).  On April 26, 2011, KTM contracted with COSCO to transport the Atlas Century from Ingleside to Abu Dhabi, U.A.E.  (D.E. 29, at 3).  GAC finalized an agreement with Best Bet on May 21, 2011 to supply the Atlas Century with assistance in towing efforts at the Corpus Christi anchorage for the final transit into the Ingleside port.  (D.E. 44, at 2; D.E. 92-1, at 1).

The Atlas Century was successfully towed to Ingleside on June 1, 2011.  (D.E. 1, at 3).  On that same day, Plaintiff filed this action against Defendants Atlas Century *in rem* and KTM Services, Inc. *in personam*, alleging a contractual breach of their towing agreement.  (D.E. 1, at 2-3).  An order for seizing the Atlas Century was issued on June 2, 2011, (D.E. 4), and the vessel has since remained in the United States Marshal's custody.  (D.E. 46-1, at 1).  As of September 16, 2011, GAC, COSCO, Signet, Bayfront, Basic, International Divers, and Seabulk have intervened in this litigation.  (D.E. 11; D.E. 29; D.E. 32; D.E. 43; D.E. 44; D.E. 57).  On December 21, 2011, it was recommended that Kiewit be allowed to intervene.  (D.E. 88).

On December 27, 2011, Bayfront and Basic filed the pending motion arguing that because the Atlas Century is a "dead ship," it is not a "vessel" sufficient to trigger this Court's maritime jurisdiction.  (D.E. 89; D.E. 99).  Plaintiff and other intervenors opposed this motion, asserting that the Atlas Century is a "vessel" and that maritime jurisdiction exists.  (D.E. 90-96).  A hearing regarding this motion to dismiss was subsequently conducted on February 13, 2012.

## II.  DISCUSSION

The limited scope of federal jurisdiction has been addressed by the Supreme Court in unambiguous terms:

> Federal courts are courts of limited jurisdiction.  They possess only
> that power authorized by Constitution and statute, which is not to

3

> be expanded by judicial decree.  It is to be presumed that a cause
> lies outside this limited jurisdiction, and the burden of establishing
> the contrary rests upon the party asserting jurisdiction.

Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) (citations omitted);

accord Del-Ray Battery Co. v. Douglas Battery Co., 635 F.3d 725, 730 (5th Cir. 2011) (quoting

Kokkonen).  As a corollary, the burden of establishing jurisdiction "cannot be placed upon the

adversary who challenges it."  Gaitor v. Peninsular & Occidental S.S. Co., 287 F.2d 252, 253

(5th Cir. 1961) (citations omitted).  Any party, including an intervenor, may contest the existence

of jurisdiction.  See Harris v. Amoco Prod. Co., 768 F.2d 669, 675 (5th Cir. 1985) ("The ...

intervenor can, among other things, move to dismiss the proceeding and can challenge the

subject matter jurisdiction of the district court.") (citation omitted).

A.      **Admiralty And Maritime Jurisdiction Over Contractual Claims.**

This Court possesses original and exclusive jurisdiction over "[a]ny civil case of

admiralty or maritime jurisdiction ...."  28 U.S.C. § 1333(1); see also U.S. Const. Art. III, § 2, cl.

1 ("The judicial Power shall extend ... to all Cases of admiralty and maritime Jurisdiction.").  A

contract dispute is within a federal court's maritime jurisdiction if the contract at issue is a

maritime contract.  Gulf Coast Shell & Aggregate LP v. Newlin, 623 F.3d 235, 240 (5th Cir.

2010) (citation omitted).  Whether a contract is maritime "'depends upon ... the nature and

character of the contract,' and the true criterion is whether it has 'reference to maritime service

or maritime transactions.'"  Norfolk S. Ry. v. Kirby, 543 U.S. 14, 24 (2004) (quoting North Pac.

S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co., 249 U.S. 119, 125 (1919)).  The Fifth

Circuit has elaborated that "[a] maritime contract is one 'relating to a ship *in its use as such*, or to

commerce or navigation on navigable waters, or to transportation by sea or to maritime

4

employment.'"  Newlin, 623 F.3d at 240 (quoting J.A.R., Inc. v. M/V Lady Lucille, 963 F.2d 96,

98 (5th Cir. 1992)) (emphasis in original); see also Theriot v. Bay Drilling Corp., 783 F.2d 527,

538 (5th Cir. 1986) ("there must be a direct and proximate juridicial link between the contract

and the operation of a ship") (citing 1 Benedict on Admiralty § 183 (7th ed. 1985)).  In

conformity with this understanding, it has long been established that contracts for the

construction or sale of a vessel are not within a federal court's admiralty jurisdiction.  See, e.g.,

Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht, 625 F.2d 44, 47 (5th Cir. 1980); Richard

Bertram & Co. v. Yacht Wanda, 447 F.2d 966, 967 (5th Cir. 1971) (per curiam).  On the other

hand, "a contract to tow another vessel is a maritime contract."  Knapp, Stout & Co. v.

McCaffrey, 177 U.S. 638, 643 (1900).

**B.**     **Vessels And Dead Ships.**

Bayfront and Basic contend that no party possesses a maritime contract because the Atlas

Century was never a "vessel" at any time relevant to this action.  (D.E. 89, at 1).  Specifically,

they argue that the Atlas Century has been a "dead ship" ever since it was cold-stacked for over a

decade by Diamond, the original owner of the drilling rig.  Id. at 9.  Furthermore, they observe

that the rig lacked proper seafaring accommodations for personnel and was partially dismantled.

Id.  Although they acknowledge that KTM entertained notions about returning the Atlas Century

back into service, they dispute that any affirmative or otherwise objective steps were taken to

make the structure seaworthy.  Id. at 9-11.  Maintaining that the rig's "vessel" status was never

restored at the time any party formed their contracts on which they now base their legal claims,

(D.E. 99, at 7), they seek dismissal of this action on the basis that no party can demonstrate

federal subject matter jurisdiction.  (D.E. 89, at 1).

5

Admiralty jurisdiction can only be maintained over contractual claims that involve a "vessel." See Pleason v. Gulfport Shipbuilding Corp., 221 F.2d 621, 622-23 (5th Cir. 1955) (determination that the subject watercraft was a "vessel" permitted admiralty jurisdiction and the enforcement of a maritime lien); Board of Comm'rs of Orleans Levee Dist. v. M/V Belle of Orleans, 535 F.3d 1299, 1306 (11th Cir. 2008) (vessel status "is crucial to establishing admiralty jurisdiction" over a contract claim).  A contract involving a "dead ship" is not maritime in nature.  See Robert E. Blake Inc. v. Excel Envtl, 104 F.3d 1158, 1160 (9th Cir. 1997) ("Contracts for services to a vessel laid up and withdrawn from navigation, i.e. a "dead ship," are ... not governed by admiralty law.") (collecting cases); Amoco Oil v. M/V Montclair, 766 F.2d 473, 477 n.3 (11th Cir. 1985) ("It is important to note that if a vessel is truly a 'dead ship' no maritime lien will attach since there would be no admiralty jurisdiction.") (citing The Hercules Co. v. Brigadier Gen. Absolom Baird, 214 F.2d 66 (3d Cir. 1954)).  Therefore, the classification of the Atlas Century as either a "vessel" or a "dead ship" is crucial in ascertaining whether admiralty jurisdiction exists.  Colonna's Shipyard, Inc. v. U.S.A.F. Gen. Hoyt S. Vandenberg, 584 F. Supp. 2d 862, 867 (E.D. Va. 2008) ("If the [watercraft] is deemed a "vessel," then the repair subcontract is clearly maritime, whereas if it is deemed a "dead ship," the subcontract for services to such non-maritime object falls outside of this Court's admiralty jurisdiction.") (citations omitted).

The Supreme Court has broadly defined the term "vessel" as "any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment" pursuant to the statutory definition in 1 U.S.C. § 3. Stewart v. Dutra Constr. Co., 543 U.S. 481, 497 (2005).  Where a watercraft has been "permanently moored or otherwise

rendered practically incapable of transportation or movement" such that "the watercraft's use 'as a means of transportation on water' is ... merely a theoretical [possibility]," it is not a "vessel." Id. at 494, 496; see also Holmes v. Atlantic Sounding Co., 437 F.3d 441, 448 (5th Cir. 2006) ("as long as a water-borne structure is practically capable of being used for transportation on navigable waters, it is a 'vessel'") (citing Stewart, 543 U.S. at 497).  While a watercraft's locomotion at any given moment is immaterial, "structures may lose their character as vessels if they have been withdrawn from the water for extended periods of time."  Stewart, 543 U.S. at 496 (citations omitted).  Because § 3 "merely codified the meaning that the term 'vessel' had acquired in general maritime law," id. at 490, the Stewart Court's understanding of "vessel" status is applicable to the determination of whether maritime jurisdiction exists.  Colonna's Shipyard, 584 F. Supp. 2d at 868 & n.6 (citing Stewart); see also Pleason, 221 F.2d at 622-23 (using the definition of "vessel" provided by § 3 to establish admiralty jurisdiction).

For admiralty contract claims, "the vessel's status at the time that the parties contracted is the determinative factor."  Goodman v. 1973 26 Foot Trojan Vessel, Ark. Registration No. AR1439SN, 859 F.2d 71, 73 (8th Cir. 1988); accord Robert E. Blake, Inc., 104 F.3d at 1160 (adopting the holding of Goodman and examining whether a ship was a vessel at the time the contract was formed); Colonna's Shipyard, 584 F. Supp. 2d at 867-68 (examining vessel status at the time the parties entered into a subcontract).  All parties to this suit allege contract claims involving the Atlas Century.  (D.E. 11; D.E. 29; D.E. 32; D.E. 43; D.E. 44; D.E. 57; D.E. 78-1). Consequently, whether there is maritime jurisdiction depends on whether the Atlas Century was no longer a "vessel" at the time the contracts underlying this case were formed.

1.      **The Atlas Century was not practically capable of maritime transportation when ownership was transferred to KTM.**

When Bayfront and Basic loaned KTM money to acquire the Atlas Century on September 30, 2010, ( D.E. 89-6, at 1-4), the rig remained cold-stacked at Sabine Pass, Texas, (D.E. 89-2, at 7; D.E. 89-5, at 5), where it had been left ever since it was decommissioned in July 1998.  (D.E. 89-1, at 1-2; D.E. 89-5, at 6).  The rig lacked thrusters, (D.E. 89-2, at 7), and the drilling package had also been removed by the previous owners.  (D.E. 89-5, at 5).  KTM confirmed that the initial plan was to sell the Atlas Century for scrap.  (D.E. 89-2, at 6; D.E. 89-5, at 6).

In light of these undisputed facts, Bayfront and Basic assert that the Atlas Century was not a vessel at the time their contract with KTM was formed.  The rig had been withdrawn from navigation for a lengthy period of time, and there was no indication that it would ever be put back to sea when KTM purchased it.  The fact that Bayfront and Basic provided financing on the understanding that the rig would be "dismantle[d] and [sold] for scrap value," (D.E. 89-6, at 1-4), suggests that no entity even contemplated returning the rig back to active service at that time. Because nothing in the record establishes that the Atlas Century was "practically capable of maritime transportation" when they financed the rig's purchase, Stewart, 543 U.S. at 497, their claim "lies outside [of this Court's] limited jurisdiction."  Kokkonen, 511 U.S. at 377.  It is therefore respectfully recommended that the Court find that the Atlas Century had "los[t] its character as a vessel" by September 30, 2010, Stewart, 543 U.S. at 496, and that Bayfront and Basic be dismissed from this action for want of subject matter jurisdiction.[2]

---

[2] In the alternative, Bayfront and Basic lack maritime contracts because financing agreements do not "'relat[e] to a ship *in its use as such*, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment.'"  Newlin, 623 F.3d at 240 (quoting M/V Lady Lucille, 963 F.2d at 98) (emphasis in

2.      **The Atlas Century was practically capable of maritime transportation by the commencement of the towing operation.**

Following KTM's purchase of the Atlas Century, it signed a lease agreement with Sabine Shipyard to reserve land on October 1, 2010 to dismantle the Atlas Century.  (D.E. 89-7, at 1-2).  Eventually, around fifty tons of scrap steel were salvaged from the rig and sold.  (D.E. 89-2, at 6).  KTM also removed three generators.  (D.E. 89-2, at 5).  Although two cranes installed on the Atlas Century were repaired, id. at 6, no physical work or services have ever been performed to return it to offshore service.  Id. at 7; (D.E. 89-5, at 5).  The rig also lacked navigational aids, life boats, and operational bilge pumps.  (D.E. 89-5, at 6).  Nothing in the record indicates that the Atlas Century's physical condition has appreciably changed since the date it was purchased by KTM.

Bayfront and Basic emphasize that "all actions taken related to the structure itself pertained to its withdrawal from navigation," (D.E. 89, at 11), and they argue that the Atlas Century's physical condition precludes a finding of vessel status on the date that any other party contracted with KTM.  Alluding to Stewart's distinction between a watercraft that is practically capable, as opposed to being merely theoretically capable, of maritime transportation, 543 U.S. at 496, they insist that any suggestion the rig was to return to service "remains strictly a theoretical possibility untethered to any fact indicating that the structure was (or is) being prepared or refurbished for a return to service on navigable waters."  (D.E. 89, at 11).

Nevertheless, Bayfront and Basic fail to show that repairs were actually necessary to

---

original).  Given that a contract to purchase a vessel has not been found to implicate admiralty jurisdiction, see Economou v. Bates, 222 F. Supp. 988, 991 (S.D.N.Y. 1963) ("it is difficult to see on what basis the purchase of a half interest in a vessel constitutes a maritime contract"), it follows that a contract to assist in the purchase of a rig cannot be maritime.  As a consequence, it is further respectfully recommended that Bayfront and Basic be dismissed for failure to demonstrate that it possesses a maritime contract over which this Court can exercise jurisdiction.

return the Atlas Century to the minimum physical condition necessary for it to be "practically capable of maritime transportation." Stewart, 543 U.S. at 497. Contrary to their assertions, the evidence in the record indicate that the Atlas Century was "practically capable of maritime transportation" even in this diminished state by May 21, 2011, the date that the Atlas Century embarked on its long voyage from the Port Arthur area to Ingleside.[3] At one or more meetings on around May 19, 2011 organized to coordinate the transportation of the drilling rig, personnel from KTM and its agent GAC assured multiple contractors that the Atlas Century was seaworthy and capable of floating without additional work or equipment. (D.E. 90-1, at 2; D.E. 90-2, at 2; D.E. 92-1, at 2). In particular, representations that the rig was operational and not going to be scrapped were made to Seabulk in order to secure a favorable price rate reserved for vessels on which maritime liens can attach. (D.E. 90-1, at 1).

Furthermore, the towing operation was designated as a "wet tow," which meant that the rig was floating on its own while being pulled by towboats. (D.E. 60-1, at 2). To ensure that the Atlas Century was capable of being pulled such a great distance, Plaintiff placed personnel on board the rig prior to the tow in order to assess its structural integrity and watertightness. (D.E. 60-1, at 2). After being satisfied that the structure was capable of waterborne transportation, Plaintiff commenced towing and did not note any difficulties encountered during the trip. Id. Two pilots and a line handling crew were also physically on the rig for a portion of the tow. Id. It is undisputed that the tow operation was successfully completed when the Atlas Century

---

[3] The affidavits of Jeff Williams, Vice President of Business Development for Seabulk, (D.E. 57-1, at 2), and D.G. ("Buddy") Hicks, Seabulk's Port Arthur Operations Manager, (D.E. 90-1, at 1), both affirm that the towing of the Atlas Century from Sabine Pass commenced on May 21, 2011. Anthony Roberts, the director of Marine Traffic and Operations for Plaintiff, attests that the towing operation began even earlier on May 14, 2011. (D.E. 60-1, at 1).

docked at Kiewit's Ingleside facility on June 1, 2011.  (D.E. 44, at 11; D.E. 78-1, at 2).

The attempts of Bayfront and Basic to depict the Atlas Century as a derelict structure are unavailing and irrelevant.  Despite the fact that Bayfront, Basic, and KTM dispute that any repair work was ever performed on the Atlas Century, independent surveyors had determined that the rig was in "very good" condition as of July 16, 2011, having "minimal corrosion wastage and absolutely no physical damage caused by impact or heavy weather wracking."  (D.E. 67-1, at 2). Even if the rig was a floating hulk solely fit for the scrapyard, dilapidated structures are not disqualified from being vessels as a matter of law.  Rather, the Fifth Circuit has suggested that a somewhat minimal showing of buoyancy and mobility may permit vessel classification:

> The "Carol Ann" was an artificial contrivance capable of being used as a means of water transportation.  It was afloat.  Before repairs, it was towed across the Gulf of Mexico; after repairs, it was towed from Port Arthur to Port Isabel, Texas.  It had a deck; it had cabins, it had superstructure.  It had no motive power of its own; no steering mechanism; but it definitely was capable of being used as a means of transportation under tow....  [I]t is plain to us that the "Carol Ann" was a "vessel" subject to a maritime lien, enforceable by suit in rem.

Pleason, 221 F.2d at 623.  Other courts have reached similar conclusions.  See, e.g., Advance Welding Co. v. M/V Corra D, 299 F. Supp. 736, 736, 738 (E.D. La. 1969) (ship that burned in an accident and was declared a "total loss" by insurance underwriters did not lose vessel status because "the hull, ribbing and keel of the [ship] remained intact after the fire" and "was capable of navigation while under tow"); Colonna's Shipyard, 584 F. Supp. 2d at 864-65, 873 (obsolete steamship that sat idle for years before being prepared for sinking and transformation into an artificial reef was a vessel because repairs were commenced allowing the ship to be "towed *on water*") (emphasis in original).  It is therefore of no moment that the Atlas Century would

11

presently be unable to serve in any economically viable capacity pending additional refitting and restoration.

To be sure, neither the Supreme Court nor the Fifth Circuit have declared that the vessel status analysis is reducible to a two-element inquiry into whether an object floats and can be moved.  Whether a structure has "been taken out of service, permanently anchored, or otherwise rendered practically incapable of maritime transport" remains critical because "structures may lose their character as vessels if they have been withdrawn from the water for extended periods of time."  Stewart, 543 U.S. at 496.  Ships that have been "taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day sail again."  Id. at 494.  In support of this proposition, the Stewart Court cited to Pavone v. Mississippi Riverboat Amusement Corp., 52 F.3d 560, 570 (5th Cir. 1995) (floating casino was deprived of its vessel status because it was permanently moored to the shore in a "semi-permanent or indefinite manner"), and Kathriner v. UNISEA, Inc., 975 F.2d 657, 660 (9th Cir. 1992) (floating processing plant was not a vessel because it was permanently moored and could not move over open water due to a "large opening [that had been] cut into her hull"), with approval.  As the Supreme Court emphasized, "[t]he question remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one."  Stewart, 543 U.S. at 496.

Bayfront and Basic point out that a number of courts in this Circuit have refused to confer vessel status upon floating structures that were towed.  See, e.g., Moore v. BIS Salamis, Inc., 748 F. Supp. 2d 598 (E.D. Tex. 2010); Rushing v. Pride Int'l, Inc., No. H-11-0294, 2011 WL 3021043 (S.D. Tex. July 22, 2011) (unpublished); Mendez v. Anadarko Petrol. Corp., No.

H-10-1755, 2010 WL 4644049 (S.D. Tex. Nov. 9, 2010) (unpublished); Case v. Omega Natchiq, Inc., No. H-08-0835, 2008 WL 2714124 (S.D. Tex. July 10, 2008) (unpublished); Jordan v. Shell Oil Co., No. G-06-265, 2007 WL 2220986 (S.D. Tex. Aug. 2, 2007) (unpublished).  In each of these cases, however, it was determined that the fact that the structures at issue were permanently moored to the ocean floor rendered them practically incapable of maritime transportation by the time of the incidents giving rise to the respective causes of action.  See Moore, 748 F. Supp. 2d at 606 ("[I]t is undisputed that the Thunder Horse was designed to remain at its current location for the duration of its service life–approximately 25 years–after which it will most likely be disassembled and scrapped.  Under these circumstances, the court finds that the Thunder Horse is a permanent structure attached to the seabed and, thus, not *practically* capable of maritime transportation.") (emphasis in original); Rushing, 2011 WL 3021043, at *6 ("Defendants do not dispute that the THUNDER HORSE is capable of laterally moving from wellhead to wellhead, up to a 350 foot radius, by tightening and loosening its sixteen permanent mooring chains....  [T]his movement is purely incidental and is insufficient to confer vessel status.") (citing Moore, 748 F. Supp. 2d at 608); Mendez, 2010 WL 4644049, at *7 ("[T]he RED HAWK Spar is theoretically capable of maritime transportation but not practically capable.  It is permanently moored to the sea floor, has been in one place since it was built in 2004, and there is no intention to move it.") (citing Pavone, 52 F.3d at 570; Stewart, 543 U.S. at 494); Case, 2008 WL 2714124, at *8 ("The mooring of the [floating platform] combined with the owners' intended use makes it inappropriate to classify it as a vessel.") (citing Johnson v. Odeco Oil & Gas Co., 864 F.2d 40, 43 (5th Cir. 1989)); Jordan, 2007 WL 2220986, at *2 ("the Court concludes that URSA, in its design and manifestation, is a *permanent structure* on the

seabed") (emphasis in original).

There is no evidence that the Atlas Century was ever permanently moored at any time. On the other hand, there is ample evidence that the rig was highly mobile on May 21, 2011 and remains capable of moving a significant distance. The Atlas Century floated while being towed on water a significant distance from Port Arthur to Ingleside, Texas. Moreover, when Tropical Storm Don was approaching the South Texas Coastal Bend area, preparations were made so that the rig could be moved out to sea in order to "ride out" the anticipated tempest.[4] (D.E. 25, at 2). Accordingly, the decisions cited by Bayfront and Basic are readily distinguishable.

Although the Atlas Century had been "withdrawn from the water for [an] extended period[ ] of time" when Bayfront and Basic financed the rig's purchase by KTM, its use "as a means of transportation on water" became more than a "practical possibility" by the time it was towed from Port Arthur. Stewart, 543 U.S. at 496; see also Colonna's Shipyard, 584 F. Supp. 2d at 871 (collecting cases and discussing circumstances in which a "dead ship" can become a vessel again).[5] Given that the Atlas Century was "practically capable of maritime

---

[4] This fact later became the basis of the order granting Signet's request for custodia legis expenses. (D.E. 77).

[5] Bayfront and Basic protest the use of any test that permits an object to oscillate between vessel and non-vessel status on the basis that it is akin to the "snapshot" test that the Supreme Court rejected in Chandris, Inc. v. Latsis, 515 U.S. 347, 363 (1995) and Stewart, 543 U.S. at 495-96. This concern is unfounded because Stewart did not preclude the possibility that structures may lose and then regain their vessel status:

> A ship long lodged in a drydock or shipyard can again be put to sea, no less than one permanently moored to shore or the ocean floor can be cut loose and made to sail. The question remains in all cases whether the watercraft's use "as a means of transportation on water" is a practical possibility or merely a theoretical one.

Id. at 496. The "snapshot" test pertained to the practice of determining vessel status merely by ascertaining whether a watercraft was moving at the relevant time for the purposes of determining whether it was "in navigation." Id. at 495. In rejecting this approach, the Supreme Court explained that whether a structure was "in navigation" is merely "relevant to whether the craft is 'used, or capable of being used' for maritime transportation" in accordance with 1 U.S.C. § 3. Id. at 496.

14

transportation" within the meaning of <u>Stewart</u> and <u>Holmes</u> when towing commenced,[6] it is therefore respectfully recommended that the rig be found to constitute a "vessel" by May 21, 2011 at the latest.[7]

> **3.   KTM's plans for the Atlas Century are consistent with a finding of vessel status by the commencement of the towing operation.**

The parties have introduced evidence and argument concerning KTM's plans to use or dispose of the Atlas Century in an attempt to shed light on the rig's vessel status.  The Supreme Court's analysis in <u>Stewart</u> focused solely on the physical characteristics of the waterborne dredge at issue, and the Court devoted no discussion to the dredge owner's subjective intent or plans.  543 U.S. at 495-96.  Moreover, <u>Stewart</u> explicitly discounted the role of the watercraft's purpose when determining whether a structure was a vessel.  <u>Id.</u> at 497 ("a 'vessel' is any watercraft practically capable of maritime transportation, <u>regardless of its primary purpose</u> or state of transit at a particular moment") (emphasis added).

The Fifth Circuit, however, recognizes that a shipowner's intent may play a significant role in determining whether a structure was "permanently moored" and therefore not practically capable of use as a means of transportation on water.  Applying <u>Stewart</u>'s definition of "vessel," the Fifth Circuit determined that a gaming boat was not a vessel notwithstanding a finding that it was "physically capable of sailing." <u>De La Rosa v. St. Charles Gaming Co.</u>, 474 F.3d 185, 187

---

[6] At this juncture, there is scant evidence in the record indicating the exact moment when the Atlas Century regained vessel status, if indeed vessel status was lost at all.  The parties have simply failed to submit affidavits or documents revealing the physical condition or capabilities of the rig prior to May 21, 2011, the date that towing operation commenced.  Nevertheless, it would not be improper to find that the Atlas Century was "practically capable of maritime transportation," <u>Stewart</u>, 543 U.S. at 497, on the date that it was actually engaged in maritime transportation.  The default presumption that parties' claims "lie[ ] outside [of this Court's] limited jurisdiction," <u>Kokkonen</u>, 511 U.S. at 377, is therefore overcome.

[7] This recommendation does not preclude the possibility that one of the litigants may subsequently establish an earlier date.

(5th Cir. 2006).  In reaching this conclusion, the court treated evidence of intent as probative of whether any withdrawal from navigation was indefinite or permanent in duration, thus rendering any potential use as a vessel "merely theoretical."  Id.  Accordingly, the Fifth Circuit considered significant the fact that the gaming boat owner "indefinitely moored [the boat] to the land by lines tied to steel pilings" and intended "to use it solely as an indefinitely moored floating casino" rather than for any maritime operation.[8]  Id.

Bayfront and Basic refer to the fact that they had originally financed KTM's purchase of the Atlas Century with an eye towards recouping the rig's scrap value because it had been inactive for over a decade.  (D.E. 89, at 9).  Their argument is undercut by countervailing evidence from Plaintiff and intervenors, which demonstrate that KTM intended to utilize the Atlas Century as an active rig in the Gulf of Mexico and the Middle East.  As early as January 10, 2011, KTM had advertised the capabilities of the Atlas Century on its web site in order to attract interest in using the rig to remove abandoned oil wells from the Gulf of Mexico.  (D.E. 91-5); Atlas Century, KTM Services, Inc., http://www.ktmservices.com/Atlas_Century.  On March 28, 2011, KTM was actively in the process of soliciting bids to tow the Atlas Century to Ingleside.  (D.E. 91, at 3; D.E. 91-6, at 1).  By April 1, 2011, KTM contracted with many of the intervenors to coordinate or assist in this towing operation, including GAC, (D.E. 11, at 2; D.E.

---

[8] There is a circuit split on the question of whether the use of shipowner's intent is appropriate in any inquiry concerning vessel status.  Like the Fifth Circuit, the Seventh Circuit has also opened the door to using the shipowner's intent to determine whether a moored boat has been "permanently" moored.  Tagliere v. Harrah's Ill. Corp., 445 F.3d 1012, 1016 (7th Cir. 2006) ("a boat ... is 'permanently' moored when its owner intends that the boat will never again sail").  On the other hand, the Eleventh Circuit views both De La Rosa and Tagliere as being inconsistent with Stewart to the extent that they suggest the use of the shipowner's intent can influence a court's determination of vessel status.  Board of Comm'rs of Orleans Levee Dist., 535 F.3d at 1311-12; see also Colonna's Shipyard, 584 F. Supp. 2d at 870-71 ("A standard devoid of the need to ascertain intent is more likely to lead to predictable and settled commercial expectations because it relies on *objective* criteria.  Accordingly, ... vessel status turns not on the intent of [any entity], but rather, whether objective facts establish that the ship is 'practically capable' of maritime transportation.").

78-1, at 2), Plaintiff, (D.E. 2-1, at 1), and Seabulk.[9]  (D.E. 57, at 2; D.E. 90-1, at 1).  KTM had

also purchased a set of four thrusters on May 4, 2011 to be delivered to Ingleside, (D.E. 91-8),

and insured both the rig and the new thrusters for the anticipated trip to GPC Shipyard in Abu

Dhabi on May 19, 2011.  (D.E. 91-9).  Moreover, the Atlas Century was re-registered under the

Liberian flag on May 17, 2011.  (D.E. 91-2).

Because KTM decided to deploy the Atlas Century as an operational rig, it is respectfully

recommended that KTM's subjective intentions are consistent with the finding of vessel status

by May 21, 2011 at the latest.

### 4.    Best Bet's contract is maritime and constitutes a sufficient basis on which to ground this Court's subject matter jurisdiction.

Bayfront and Basic maintain that the Atlas Century was never a vessel at any time

relevant to this litigation; however, they only supply facts tending to show that it was not a

vessel at the time they financed KTM's purchase of the rig.  Just because the Atlas Century was

not a vessel when they contracted with KTM does not mean that this Court is divested of subject

matter jurisdiction over any valid maritime claims that other parties to this action have.

Given that the Atlas Century was a vessel when certain parties began towing the rig to

---

[9] Bob Bandos of GAC testified that "[a]t the time GAC contracted with KTM, GAC was advised by KTM that the rig was due to be transported to the Middle East to be used in the production of oil and gas.  At no time was GAC advised by KTM, or any other party, that the ATLAS CENTURY was to be sold for scrap."  (D.E. 93-1, at 2).  Similarly, D.G. Hicks, Jr. of Seabulk testified that "[b]efore providing a quote, I specifically asked GAC whether the rig was to be moved for scrap purposes, and GAC said it was to be outfitted for purposes of operating in the Gulf of Mexico.  I asked about the intended use of the rig to make sure it was a vessel to which Seabulk was providing credit, so that I could be assured that Seabulk would have a maritime lien.  Upon representation that the ATLAS CENTURY was a vessel in operation, I did not require payment in advance."  (D.E. 90-1, at 1).  These statements were raised by counsel at the oral argument as evidence that their clients had contracts with maritime liens.  However, the contracts are not included in the record.  The statements do not definitively establish that the Atlas Century was capable of maritime transportation at the time of the contract.  Moreover, without these contracts, it is uncertain whether the language is ambiguous warranting a consideration of extrinsic evidence.  See Curtis Callais Welding, Inc. v. Stolt Comex Seaway Holdings, Inc., 129 F. App'x 45, 54 (5th Cir. 2005) (per curiam) (unpublished).

Ingleside on May 21, 2011, and because Best Bet contracted to supply the Atlas Century with

various provisions and services to assist the drilling rig to the berth at Ingleside on May 21,

2011, (D.E. 92-1, at 2), there is at least one maritime contract claim before this Court.  The fact

that an intervenor of right, rather than Plaintiff, has been able to demonstrate a maritime contract

at this juncture is irrelevant.  See Brown v. Demco, Inc., 792 F.2d 478, 480-81 (5th Cir. 1986)

("Under federal law, an intervenor of right is treated as if he were an original party and has equal

standing with the original parties.") (citation and internal quotations omitted); Marcaida v.

Rascoe, 569 F.2d 828, 831 (5th Cir. 1978) (per curiam) ("an intervenor is treated as if he were an

original party and has equal standing with the original parties") (citing Ross v. Bernhard, 396

U.S. 531, 541 n.15 (1970)); accord In re Bayshore Ford Trucks Sales, Inc., 471 F.3d 1233, 1246

(11th Cir. 2006) (quoting Marcaida); Montcalm Pub. Corp. v. Commonwealth of Virginia, 199

F.3d 168, 172 (4th Cir. 1999) (citation omitted).

Accordingly, it is respectfully recommended that federal subject matter jurisdiction exists

over Best Bet's maritime contract.

> **5.      Signet's contract is also maritime and constitutes a sufficient and
> independent basis on which to ground this Court's subject matter
> jurisdiction.**

In response to the motion to dismiss, Signet explained that it was hired to assist in towing

the Atlas Century from near the Port Aransas jetties to Ingleside, Texas.  (D.E. 90-2, at 1).  As

with other litigants, Signet does not provide its contract with KTM.  However, it supplied a

declaration by Jackie Yardley, who provided insight into Signet's contract with KTM:

> I attended a meeting(s) with employees of KTM, GAC, and other
> vendors.  This meeting occurred on or about May 30, 2011, and in
> any event before the towage of the ATLAS CENTURY.  This
> meeting was held to determine the scope of the services to be

> provided by the various vendors, i.e., it was at this meeting (and/or
> in subsequent conversations) that the scope of the contract for
> towage was defined.

Id.  Thus, after the Atlas Century began its maritime travel from Sabine Pass on May 21, 2011,

KTM either entered a contract or revised its contract with Signet regarding towing services.[10]  At

that time, the Atlas Century was a vessel for purposes of admiralty jurisdiction.[11]

Accordingly, it is respectfully recommended that federal subject matter jurisdiction exists

over Signet's maritime contract.

## C.   Supplemental Jurisdiction Exists Over The Remaining Parties.

As long as one of the intervenors can show that their claims derive from a maritime

contract, Bayfront and Basic cannot demonstrate that this action falls outside of this Court's

subject matter jurisdiction.

Pursuant to 28 U.S.C. § 1367(a), the existence of original jurisdiction not premised on

diversity enables this Court to entertain "supplemental jurisdiction" over pendent-party claims

regardless of whether there would have been original jurisdiction over those claims:

---

[10] Although Jackie Yardley affirms that the May 30, 2011 meeting took place before the "towage of the Atlas Century," (D.E. 90-2, at 1), it is apparent that this was meant with respect to Signet's role in the final phase of the towing operation when the rig was being pulled to the Ingleside port.  This understanding comports with the declaration of Peter S. MacCallum, Jr., the President of Best Bet, who testified that "[w]hile planning for the arrival of the vessel, I attended various meetings in Ingleside, Texas" after May 21, 2011.  (D.E. 92-1, at 2).

[11] Moreover, on October 3, 2011, a memorandum and recommendation was issued recommending that Signet's barge and tug services after the arrest of the Atlas Century were custodia legis expenses.  (D.E. 69).  Bayfront and Basic did not object to this recommendation.  On October 27, 2011, the Court adopted this memorandum and recommendation.  (D.E. 77).  Custodia legis expenses receive priority payment for in rem admiralty claims.  See Beauregard, Inc. v. Sword Servs. L.L.C., 107 F.3d 351, 353 (5th Cir. 1997) ("Courts routinely enter orders that divide the custodia legis expenses among the parties of an in rem action."); General Elec. Credit & Leasing Corp. v. Drill Ship Mission Exploration, 668 F.2d 811, 815 (5th Cir. 1982) ("The expenses of maintaining and preserving the vessel after it has been seized under legal process-while it is in custodia legis-are included within this priority.").  Because the failure to object to the memorandum and recommendation generally precludes litigants such as Bayfront and Basic from challenging on appeal the factual findings and legal conclusions adopted by this Court, see Douglas v. United Servs. Auto Ass'n, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc) (forfeiture due to failure to object to magistrate judge's recommendations is reviewed only for plain error), they have effectively conceded that Signet is entitled to in rem recovery against the value of the Atlas Century.

> [I]n any civil action of which the district courts have original
> jurisdiction, the district courts shall have supplemental jurisdiction
> over all other claims that are so related to claims in the action
> within such original jurisdiction that they form part of the same
> case or controversy under Article III of the United States
> Constitution.  Such supplemental jurisdiction shall include claims
> that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a); see also Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 559

(2005) (§ 1367(a) permits jurisdiction over both "pendent-claim and pendent-party cases").

Supplemental jurisdiction may be invoked in actions involving a federal court's maritime

jurisdiction.[12]  See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527,

548 (1995) (after finding the requisite admiralty jurisdiction, citing § 1367 "the court should

engage in the usual supplemental jurisdiction and impleader inquiries") (O'Connor, J.,

concurring); Debellefeuille v. Vastar Offshore, Inc., 139 F. Supp. 2d 821, 824 (S.D. Tex. 2001)

(maritime tort established a basis for the exercise of supplemental jurisdiction over non-maritime

parties) (collecting cases); Efferson v. Kaiser Aluminum & Chem. Corp., 816 F. Supp. 1103,

1122 (E.D. La. 1993) (valid admiralty claim enabled supplemental jurisdiction over other state

law claims).  The failure of a party to explicitly cite to § 1367 as a basis of jurisdiction "will not

defeat jurisdiction if the facts alleged in the complaint satisfy the jurisdictional requirements of

the statute."  Hildebrand v. Honeywell, Inc., 622 F.2d 179, 181 (5th Cir. 1980) (citation omitted).

It has been recognized that the expansive language of § 1367(a) allows both intervenors

as of right and permissive intervenors to "claim supplemental jurisdiction if their claims are

---

[12] The Fifth Circuit has even gone as far as to hold that in cases involving original claims for maritime
jurisdiction, district courts possess supplemental jurisdiction over pendent-party claims in the absence of § 1367.
See Loeber v. Bay Tankers, Inc., 924 F.2d 1340, 1346 n.3, 1347 (5th Cir. 1991) (per curiam) ("'we see no reason at
this juncture to depart from the established rule of this Circuit that pendent party jurisdiction is available in the
unique area of admiralty'") (citation omitted).

deemed part of the same case or controversy." 7C Charles Alan Wright & Arthur R. Miller,

Federal Practice and Procedure § 1917 (3d ed. 2007). The Article III "case or controversy"

requirement is met where the claims "derive from a common nucleus of operative fact" and

"would ordinarily be expected to [be tried] all in one judicial proceeding."[13] United Mine

Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966) (citation omitted); see also City of Chicago

v. Int'l College of Surgeons, 522 U.S. 156, 165 (1997) (applying the "common nucleus of

operative fact" test to determine whether § 1367(a)'s Article III "case or controversy"

requirement is satisfied) (quoting Gibbs); State Nat'l Ins. Co. v. Yates, 391 F.3d 577, 579 & n.13

(5th Cir. 2004) (same) (citing Gibbs; Int'l College of Surgeons).

Best Bet and Signet have properly asserted maritime contract claims against Defendants

regarding the unpaid expenses stemming from the transportation and provision of necessaries to

the Atlas Century. Because all other parties, with the exception of Bayfront and Basic, have

brought similar breach of contract claims against Defendants relating to the same effort to

transport and care for the Atlas Century, these claims share a "common nucleus of operative

fact" that should be tried in one judicial proceeding, Gibbs, 383 U.S. at 725 (citation omitted),

thereby satisfying Article III's "case or controversy" requirement. Although each party entered

into separate contracts with KTM, at least one court has held that a defendant's failure to pay

various in rem lien claimants pursuant to contracts relating to the servicing of the res constituted

the "same case or controversy" within the meaning of Article III and § 1367. See Gardes

---

[13] A number of scholars have advanced the proposition that the "common nucleus of operative fact"
standard enunciated in Gibbs has no constitutional dimension and therefore applies an excessively restrictive test in
determining which claims fall within the scope of an Article III "case or controversy." See generally C. Douglas
Floyd, Three Faces of Supplemental Jurisdiction After the Demise of United Mine Workers v. Gibbs, 60 Fla. L. Rev.
277 (2008). A broader understanding of the Article III's "case or controversy" requirement would allow for the
more robust exercise of supplemental jurisdiction pursuant to § 1367.

<u>Directional Drilling v. U.S. Turnkey Exploration, Inc.</u>, 815 F. Supp. 956, 964 (W.D. La. 1993) ("[T]his court must determine the remedy due those claimants whose rights have been impaired in order to effectuate its judgment as to those claimants' rights.  These claims are all so closely related to one another that a plaintiff would ordinarily be expected to litigate them all in one judicial proceeding.").

Neither the Supreme Court nor the Fifth Circuit have addressed whether supplemental jurisdiction may be maintained over an action if an intervenor as of right is the only party that proves it belongs in federal court.  Nevertheless, the Fifth Circuit has declared that "[a]n intervenor of right under Rule 24(a) 'is treated as if he were an original party and has equal standing with the original parties.'"   <u>Donovan v. Oil, Chem., & Atomic Workers Int'l Union & its Local 4-23</u>, 718 F.2d 1341, 1350 (5th Cir. 1983) (quoting Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1920 (1972)).[14]  Furthermore, the Fifth Circuit repeated this general rule according intervenors as of right original party status in the context of an action involving a maritime seizure.  <u>Beauregard, Inc</u>, 107 F.3d at 354 n.9 (citation omitted).  Given that intervenors as of right have equal standing with the original parties, it therefore follows that

_____

[14] The Fifth Circuit does not go so far as to conflate the rights of permissive intervenor with that of an original party:

> [T]he [permissive] intervenor's mere presence in an action does not clothe it with the status of an original party.  To be sure, there are some senses in which an "intervenor is treated as if he were an original party and has equal standing with the original parties."  The permissive intervenor can, among other things, move to dismiss the proceeding and can challenge the subject matter jurisdiction of the district court.  But these participatory rights remain subject to the intervenor's threshold dependency on the original parties' claims, for it is equally well-established that "[a]n existing suit with the court's jurisdiction is a prerequisite of an intervention, which is an ancillary proceeding in an already instituted suit."

<u>Harris</u>, 768 F.2d at 675 (citations omitted).  Because there are no permissive intervenors to this action, the Fifth Circuit's commentary in <u>Harris</u> is inapplicable.

this Court's ability to hear the maritime claim of one intervenor provides sufficient ground on which to exercise supplemental jurisdiction over other properly added parties advancing claims forming part of the same "case or controversy."  To hold otherwise would be inefficient and ineffectual, as the party asserting a valid maritime lien would simply reinstate the action as the plaintiff, allowing the parties possessing non-federal claims to shuffle back into the litigation as intervenors.  See Gibbs, 383 U.S. at 726 (discussing how supplemental jurisdiction's rationale "lies in considerations of judicial economy, convenience and fairness to litigants").  In other words, this pending motion seeks a perverse result–after the arrest of the Atlas Century is vacated, Best Bet or Signet would merely return to federal court seeking another arrest of the rig with the remaining litigants in tow as intervenors as of right.

Because they are intervenors as of right, the maritime claims of Best Bet and Signet enable the extension of supplemental jurisdiction over all parties to this action who seek recovery in contract for the unpaid services they rendered in the common effort to transport and maintain the Atlas Century.  Supplemental jurisdiction cannot be exercised over the claims of Bayfront and Basic because their contracts to finance the purchase of the rig fall outside the scope of the "case or controversy" at hand.  Therefore, it is respectfully recommended that federal subject matter jurisdiction only be exercised over Plaintiff,[15] GAC, Kiewit,[16] COSCO,

---

[15] It should be noted that Plaintiff may independently satisfy the jurisdictional minimum for diversity jurisdiction pursuant to 28 U.S.C. § 1332, thus allowing it to remain in federal court should its attempt to enforce a maritime lien fail.  Given that most of the intervenors are Texas entities, however, supplemental jurisdiction cannot be used as a basis for allowing them to remain in this action unless they can each demonstrate the existence of federal question or maritime jurisdiction.  See 28 U.S.C. § 1367(b) ("In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction ... when exercising supplemental jurisdiction ... would be inconsistent with the jurisdictional requirements of section 1332."); Exxon Mobil Corp., 545 U.S. at 554 ("Incomplete diversity destroys original jurisdiction with respect to all claims, so there is nothing to which supplemental jurisdiction can adhere.").

[16] This recommendation is made contingent on the Court's admission of Kiewit into this action.

23

and Seabulk.

### III.  RECOMMENDATION

Based on the foregoing reasons, it is respectfully recommended that this motion to vacate arrest and dismiss all in rem claims, (D.E. 89), be granted in part and denied in part. Specifically, it is respectfully recommended that (1) Basic and Bayfront be dismissed for lack of subject matter jurisdiction; (2) the Atlas Century remain under arrest; (3) the motion to vacate the order to sell the Atlas Century be denied; and (4) the motion to dismiss against Plaintiff, Best Bet, GAC, Kiewit, COSCO, Seabulk, and Signet be denied.[17]

Respectfully submitted on this 9th day of March 2012.

_____
BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE

---

[17] Because many of the claimants have not proven that the Atlas Century was a "vessel" at the time they contracted with KTM, they will still need to demonstrate that they are entitled to in rem maritime liens.  If they cannot make this showing, then state–not federal–law governs the adjudication of their claims.

24

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1); Rule 72(b) of the Federal Rules of Civil Procedure; Rule 8(b) of the Rules Governing § 2254 Cases; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).