IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LOUISIANA INTERNATIONAL MARINE, L.L.C. | § § § | |
| v. | § § | C.A. NO. C-11-186 |
| The Drilling Rig ATLAS CENTURY, *and her engines, tackle, apparel, appurtenances, etc., in rem, and* KTM SERVICES, INC., *in personam* | § § § § § | Admiralty Fed. R. Civ. P. 9(h) |

**MEMORANDUM AND RECOMMENDATION REGARDING
KIEWIT'S MOTION FOR APPROVAL OF CUSTODIA LEGIS EXPENSES**

This is an admiralty action filed pursuant to Supplemental Rule C of the Federal Rules of Civil Procedure. Pending is Intervenor Kiewit Offshore Services, Ltd.'s ("Kiewit") motion to include the costs of various services it provided to the Atlas Century as <u>custodia legis</u> expenses. (D.E. 108). Intervenor COSCO Shipping, Co., Ltd. ("COSCO") filed a response opposing Kiewit's motion on April 30, 2012. (D.E. 111). For the following reasons, it is respectfully recommended that Kiewit's motion be granted in part and denied in part.

**I. JURISDICTION**

This Court has jurisdiction pursuant to 28 U.S.C. § 1333 over maritime claims.

**II. BACKGROUND**

Beginning on April 1, 2011, Defendant KTM entered into various contracts with Plaintiff Louisiana International Marine, L.L.C. and some of the other Intervenors to tow the semi-submersible drilling rig Atlas Century from Sabine Pass, Texas. On May 24, 2011, KTM entered into a contract with Kiewit designating its docking facility at Ingleside, Texas as the site where Kiewit would undertake certain preparations to help load the Atlas Century and its thrusters on to the Xiang Yun Kou heavy lift transport vessel. (D.E. 108-2, at 1). Specifically,

the cost of using a deep draft hole to support loading operations was $265,000, and the cost of offloading thrusters from a transport barge and loading them onto the Xiang Yun Kou was $63,500. Id. at 8. In addition, the dockage fee for the Atlas Century was priced at $2,000 per day. Id. at 12.

The Atlas Century was successfully towed to Kiewit's Ingleside docking facility on June 1, 2011. (D.E. 1, at 3; D.E. 78-1, at 2). On that same day, Plaintiff filed this action against Defendants Atlas Century in rem and KTM in personam, alleging a contractual breach of their towing agreement. (D.E. 1, at 2-3). An order seizing the Atlas Century was issued on June 2, 2011, (D.E. 4), and the vessel has remained in the United States Marshal's custody at Kiewit's dock since June 3, 2011. (D.E. 7). As of March 19, 2012, GAC Shipping (USA), Inc. ("GAC"), COSCO, Signet Maritime Corp. ("Signet"), International Divers Co., Inc. d/b/a Best Bet Line Handlers ("Best Bet"), Seabulk Towing Services, Inc. ("Seabulk"), and Kiewit have intervened and remain in this litigation. (D.E. 11; D.E. 29; D.E. 32; D.E. 44; D.E. 57; D.E. 104).

After the Atlas Century's seizure, and in the absence of a court order, Kiewit attempted to perform its obligations pursuant to the contract with KTM. It committed materials, manpower, and equipment to receive the Atlas Century, clean up a spill resulting from a hydraulic leak, shift the rig, prepare it for loadout onto the Xiang Yun Kou, as well as offload the thrusters. (D.E. 108, at 2). Kiewit also made preparations with Signet to protect the Atlas Century when Tropical Storm Don approached the area. Id.; (D.E. 110, at 1-2). The last recorded date that work was done on the Atlas Century was October 9, 2011. (D.E. 108-3, at 32).

On April 9, 2012, Kiewit submitted this motion seeking to include all charges related to

the work performed on the Atlas Century from June 1, 2011 to April 6, 2012 as <u>custodia</u> <u>legis</u> expenses.  (D.E. 108).  These charges, totaling $826,195.40, consist of (1) $101,305.40 for receiving the rig, cleanup of a hydraulic leak, as well as the inspection, preparation, and shifting of the vessel pursuant to contractual rates; (2) $31,750 for performance of its contractual duty to offload thrusters purchased by KTM; (3) $73,140 for the provision of tugboats in anticipation of Tropical Storm Don's arrival; and (4) $620,000 for the provision of dockage at the contractual rate of $2,000 per day.  <u>Id.</u> at 1-2.

In response, COSCO filed a brief opposing this motion on the basis that these charges inure to the sole benefit of Kiewit and therefore cannot be included as expenses in <u>custodia</u> <u>legis</u>.  (D.E. 111).  Signet has filed a supplemental brief clarifying certain facts asserted by Kiewit, but it does not oppose the motion.  (D.E. 110).  On May 2, 2012, Kiewit was ordered to provide a reply.  (D.E. 112).  No reply brief was submitted within the prescribed time.

### III.  DISCUSSION

In general, "there can be no maritime lien for services furnished a vessel while in custodia legis."  <u>New York Dock Co. v. The Poznan</u>, 274 U.S. 117, 120 (1927) (citations omitted); <u>accord</u> <u>Kingstate Oil v. M/V Green Star</u>, 815 F.2d 918, 922 (3d Cir. 1987) ("A person furnishing goods or services to a vessel after its arrest (in *custodia legis*) does not acquire a maritime lien against the vessel for the value of those goods or services.").  Parties that provide goods or services to an arrested vessel without prior court authority typically "act at their own peril."  <u>Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S.</u>, 10 F.3d 176, 181 (3d Cir. 1993).  Nevertheless, it is equally well-established that an admiralty court may exercise its equitable authority over the proceeds of a vessel sale to prioritize repayment of an expense

that provided a "common benefit" for all claimants:

> The most elementary notion of justice would seem to require that services or property furnished upon the authority of the court or its officer, acting within his authority, for the common benefit of those interested in a fund administered by the court, should be paid from the fund as an 'expense of justice.' ...
> Such preferential payments are mere incidents to the judicial administration of a fund....  They result rather from the self-imposed duty of the court, in the exercise of its accustomed jurisdiction, to require that expenses which have contributed either to the preservation or creation of the fund in its custody shall be paid before a general distribution among those entitled to receive it.
> ... The court of admiralty is asked, in the exercise of its admiralty jurisdiction, to administer the fund within its custody in accordance with equitable principles as is its wont.  It is defraying from the proceeds of the ship in its registry an expense which it has permitted for the common benefit and which, in equity and good conscience, should be satisfied before the libelants may enjoy the fruit of their liens.

The Poznan, 274 U.S. at 121-22 (citations omitted); see also Beauregard, Inc. v. Sword Servs. L.L.C., 107 F.3d 351, 353 (5th Cir. 1997) ("At the judicially ordered sale, the cost of maintenance is deducted from the sale proceeds before the remaining proceeds are divided among the claimants.  Therefore, even when a single litigant advances the cost of maintenance, all claimants are eventually required to share in this cost.") (citation omitted).  Hence, district courts sitting in admiralty "routinely enter orders that divide the *custodia legis* expenses among the parties of an *in rem* action."  Beauregard, Inc., 107 F.3d at 353.

The scope of custodia legis expenses recoverable against the vessel generally include "services or property advanced to preserve and maintain the vessel under seizure, furnished upon authority of the court."  Gen. Elec. Credit & Leasing Corp. v. Drill Ship Mission Exploration, 668 F.2d 811, 816 (5th Cir. 1982) (collecting cases).  In accordance with the "common benefit"

standard articulated in The Poznan, 274 U.S. at 122-23, other circuits have similarly held that custodia legis expenses can encompass all expenditures for the preservation of the arrested vessel and inure to the benefit of all the claimants.  See, e.g., Transamerica Commercial Fin. Corp. v. F/V Smilelee, 944 F.2d 186, 189 (4th Cir. 1991); Kingstate Oil, 815 F.2d at 923; cf. Oil Shipping (Bunkering) B.V., 10 F.3d at 182-83 (while "expenses that are necessary to preserve the value of the res are in the category of *in custodia legis* expenses," post-arrest expenses that increase the value of the res are not automatically included as custodia legis expenses).  So long as equity and good conscience warrant, a claimant may even obtain reimbursement for the expenses it incurred when taking unilateral steps to maintain the seized property.  See Drill Ship Mission Exploration, 668 F.2d at 815 ("While it is preferable to secure a court order authorizing this expense before incurring it, nevertheless even in the absence of court order these 'custodia legis expenses' may be ordered by the court to be paid in priority to the seizing mortgage creditor if 'equity and good conscience' so require.") (citing The Poznan).  However, the party seeking to include certain expenditures as expenses in custodia legis bears the "burden of proving that the costs were equitably incurred." Nat'l Bank of N. Am. v. S.S. Oceanic Ondine, 315 F. Supp. 386, 388 (S.D. Tex. 1970).

**A.      Pre-Seizure Charges Cannot Be Included As Custodia Legis Expenses.**

As a definitional matter, all custodia legis expenses must be incurred after the seizure and arrest of the subject vessel.  Gen. Elec. Credit Corp. v. Oil Screw Triton VI, 712 F.2d 991, 993 (5th Cir. 1983) (explaining that custodia legis expenses are "costs of preserving the vessel after it is placed under jurisdiction of the court ... through arrest by the United States marshal"); United States v. One (1) 254 Ft. Freighter, the M/V Andoria, 570 F. Supp. 413, 416 (E.D. La. 1983)

("only those expenses for services or property furnished the M/V Andoria *after* its seizure by the U.S. Marshal ... can be considered to have been incurred while the vessel was *in custodia legis*.") (emphasis in original); Murray v. The Meteor, 83 F. Supp. 212, 212 (E.D.N.Y. 1949) (a vessel is in custodia legis when it is "in the custody of the Marshal of this Court").  "Conversely, any expenses for services or property provided *before* that date were not incurred during *custodia legis*."  One (1) 254 Ft. Freighter, the M/V Andoria, 570 F. Supp. at 416 (emphasis in original); see also Effjohn Int'l Cruise Holdings, Inc. v. M/V Enchanged Isle, No. Civ. A. 01-2679, 2002 WL 1433877, at *1 (E.D. La. June 28, 2002) (unpublished) ("The expenditures and services at issue in the instant motion were incurred before the seizure of the *Isle*, not during the *custodia legis* of the Court and not upon the authority of this Court.  Thus, they are not entitled to be treated as *custodia legis* expenses.").

    While the record indicates that the Atlas Century arrived at Kiewit's docking facility on June 1, 2011, (D.E. 78-1, at 2), the vessel was not seized by the Marshals until June 3, 2011. (D.E. 7).  Kiewit's attached "Labor Details" documents indicate that it performed work on the rig before it was seized.  (D.E. 108-3, at 28-32).  Moreover, Kiewit specifically seeks to include charges associated with "receiving the rig" as custodia legis expenses even though seizure occurred two days after the rig docked.  (D.E. 108, at 2).  Accordingly, it is respectfully recommended that any expenses incurred by Kiewit prior to the date the Atlas Century was seized are not custodia legis expenses.

**B.    All Post-Seizure Charges Resulting From Purely Contractual Performance Cannot Be Included As Custodia Legis Expenses.**

    It is manifest that the charges for the performance of a pre-arrest contractual obligation forming the subject matter of the underlying dispute cannot be deemed custodia legis expenses

unless it can be demonstrated that they are necessary for the preservation of the vessel. A holding otherwise would completely undermine the rule against permitting maritime liens for services furnished to a vessel while in custodia legis. The Poznan, 274 U.S. at 120. In effect, such an outcome would allow a party seeking to recover for breach of an unperformed pre-seizure contract to not only obtain recovery against the vessel for full value of the post-seizure contractual performance, including profits that inure only to the benefit of the performing party, but also enjoy the benefit of higher payment priority relative to all other creditors pursuing similar claims. In addition, there is a risk that such post-seizure contractual performance will result in a smaller recovery for the remaining claimants. For example, the performing party may do a bad job and decrease the value of the res. It is also possible that performance becomes more expensive than originally envisioned by the contracting parties.

  Even assuming all goods or services provided post-seizure pursuant to a pre-seizure contract actually increase the value of the res as well as each creditor's final share, the performing party's favored payment priority status gives it an inequitable benefit when the value of the res is still insufficient to cover all asserted debts. As the Third Circuit recognized, certain claimants would be able to consistently obtain priority over others:

> Inclusion of every valuable post-arrest supply in the category of administrative expenses [in custodia legis] would prefer the interests of suppliers whose provisions may not be immediately consumed, such as fuel or equipment suppliers, over those who provide an essential service, such as stevedores, or the suppliers of necessary consumable provisions, such as caterers. The suppliers of durable, or unconsumed, goods could then claim the proceeds of the sale of any tangibles they had supplied which were still on board unconsumed at the time of sale, while the priority of those supplying services or consumables would gradually disappear as their services or supplies were consumed.

Oil Shipping (Bunkering) B.V., 10 F.3d at 183.  In order to prevent disparate treatment of claimants on the arbitrary basis of whether their contracts are capable of being performed before or after the seizure, the Third Circuit established as a rule that all unauthorized post-seizure expenses that are not demonstrably necessary for the preservation of the subject vessel would not be included as expenses in custodia legis.  Id. ("Classification of an item supplied after arrest as an *in custodia legis* expense depends not only on whether it inured to the benefit of the claimants but also on whether it preserved the *res*.").  This reasoning is persuasive and guides the analysis of Kiewit's motion.

Kiewit seeks to obtain the benefit of its bargain according to the rates set forth in its contract with KTM as custodia legis expenses.  Of the charges it seeks to recoup, two appear to be wholly contemplated and governed by the underlying contract[1] between Kiewit and KTM: (1)

---

[1] In pertinent part, the contract mandates:

> Contractor shall furnish all materials and/or to furnish all labor, tools, equipment and supplies necessary to perform the Work.  The Work is generally described as follows: <u>Permit usage of deep draft hole in support of loading operations of the Atlas Century onto Xiang Yun Kou (HLV) transport vessel as further described in Attachment 2.  Offload thrusters from transport barge and loadout onto HLV.</u>

(D.E. 108-2, at 1).  The document designated as "Attachment 2" provides:

> Lump sum pricing given in Attachment 1 is based on the following:
> 1. No Dockside mooring for semisubmersible rig is included in this proposal and it is assumed that the rig will load onto the ship on arrival.  Any rig support required while docked will be done on a reimbursable basis per Attachment 3.
> 2. Supply one 15 ton LWT anchor including 2 shots of 3" chain, buoy, and retrieval wire.  Lump sum pricing includes all labor, equipment and material necessary to install and remove anchor as required.
> 3. Survey assistance to set buoys and locate Heavy Lift Vessel over deep hole.
> 4. Deep hole usage included in lump sum pricing is based on a single use.  Proposal covers rigger assistance with dock side mooring lines from the Vessel while in deep hole.
> 5. Provide two Yokohama fenders for ship docking.

the $101,305.40 in fees for receiving the rig, cleanup of a hydraulic leak, as well as the inspection, preparation, and shifting of the vessel pursuant to contractual rates, and (2) the $31,750 for the performance of its contractual duty to offload thrusters purchased by KTM.

### 1.     Fees associated with the cleanup, inspection, preparation, and shifting of the rig are not custodia legis expenses.

Kiewit has not carried its burden of demonstrating that the cleanup, inspection, preparation, and shifting of the Atlas Century was necessary for the preservation of the vessel. To the contrary, the underlying contract seems to contemplate that such measures be taken by Kiewit in order to load the rig onto the Xiang Yun Kou heavy lift vessel. Even Kiewit's motion concedes that it was preparing the rig for "load out" and that at least some of the costs it now claims as custodia legis expenses were originally to be "charged by [Kiewit] to KTM." (D.E. 108, at 2).

These charges were incurred pursuant to contract rather than to preserve the value of the Atlas Century. Although Kiewit has included documentation for the inspections done, (D.E. 108-3, at 20-23), it has not described how they contribute to preserving the vessel. Moreover, the rig was shifted "due to delays on the Atlas loadout," id. at 3, a purpose unrelated to maintaining the rig. Finally, the cleanup of the hydraulic leak has not been adequately explained

---

...
11.   Offload and loadout of 4 thrusters using one CC2800 crane. Certified lift rigging will be supplied by owner for loadout of thrusters. Any additional rigging needed not in KOS inventory is considered reimbursable.
12.   Pricing based on setting all thrusters Portside of the ship. No rotation of the ship has been considered in the lump sum pricing. Any additional labor or equipment necessary to rotate the ship is offered on a reimbursable basis.

(D.E. 108-2, at 9).

to justify inclusion as custodia legis expenses. If this leak occurred in the process of preparing the Atlas Century for loading onto the heavy lift vessel, then the cleanup costs would be covered by the contract. (D.E. 108-2, at 5).[2] In the absence of any showing by Kiewit to the contrary, it cannot simply be presumed that the cleanup was necessary for the preservation of the vessel.

Even if some of these post-seizure contractual performances were necessary to preserve the rig, see Drill Ship Mission Exploration, 668 F.2d at 813, 815-16 (party that provided food services prior to the vessel's seizure was allowed to include costs of food services it provided after the seizure as custodia legis expenses), Kiewit has not adequately distinguished these maintenance charges from unnecessary measures taken wholly in the performance of its contract. See Oil Shipping (Bunkering) B.V., 10 F.3d at 183 ("While fuel and oil may, in certain circumstances, be necessities for which priority is appropriate, a court does not abuse its discretion when it refuses administrative priority to an expense for fuel that is neither necessary to preserve the *res* nor ordered by the court."). More significantly, Kiewit never bothered to separate the costs of performing these tasks from the profit that it seeks to obtain from KTM. As it stands, the requested $101,305.40 represents both the actual cost of the work performed in addition to an unknown profit margin that admittedly includes "a fifteen percent mark-up charged by KOS to KTM," (D.E. 108, at 2), pursuant to the reimbursable rate schedules. (D.E. 108-2, at 12-13). Given these uncertainties, it is respectfully recommended that these fees are

---

[2] In a section entitled "Liability For Pollution Or Hazardous Waste," the contract provides:

> Neither Party shall permit trash, waste oil, bilge water, or other pollutants to be discharged or to escape from equipment or containers. Each Party shall take reasonable measure to instruct its personnel in such matters, and to prevent such pollution, and will clean up any such pollution caused by it in the course of its operations.

(D.E. 108-2, at 5).

not custodia legis expenses.

### 2. Fees for offloading of thrusters pursuant to contract are not custodia legis expenses.

Likewise, offloading a set of newly purchased thrusters from a transport barge before loading them onto the heavy lift vessel does not inure to the benefit of all claimants. Not only was this effort governed by an express contract provision, (D.E. 108-2, at 1, 8; D.E. 108-5, at 1), but given that the thrusters were never attached to the Atlas Century, moving them from place to place also does nothing to preserve the res. Far from benefitting all claimants, performance of this pre-seizure contractual obligation benefits only Kiewit by providing it an actionable claim against Defendants. See Nat'l Bank of N. Am., 315 F. Supp. at 388 (refusing to include costs associated with shifting two vessels as custodia legis expenses because the movement solely benefitted the movant's business operation and did not help preserve the ships); Economy Stone Midstream Fuel, L.L.C. v. M/V A.M. Thompson, No: 4:08CV127, 2009 WL 1033609, at *1 (N.D. Miss. Apr. 16, 2009) (unpublished) (insurance policy taken out in movant's name did not inure to the benefit of any claimant other than the movant and could not be reimbursed as custodia legis expenses).

The attempt to include charges associated with this endeavor as custodia legis expenses constitutes a bold attempt by Kiewit to obtain higher priority payment of its contractual damages, which would reduce the recovery of other claimants if the sale price of the Atlas Century does not exceed all debts incurred by KTM. Equity and good conscience do not permit Kiewit to claim a custodia legis payment preference for fulfilling its contractual duties to KTM, especially when performance confers no recognizable benefit to the remaining claimants. Therefore, it is respectfully recommended that these claimed charges are not custodia legis

expenses.

**C.    Some Charges Associated With The Preparation For The Arrival Of Tropical Storm Don Can Be Included As <u>Custodia</u> <u>Legis</u> Expenses.**

As Tropical Storm Don approached the coast, Kiewit made arrangements with Signet for the provision of tugboats in the event that the Atlas Century needed to be towed out to sea to ride out the storm. Kiewit claims a total of $73,140 in <u>custodia</u> <u>legis</u> expenses related to securing these tugboats from Signet.

In a supplemental brief, (D.E. 110, at 1-2), Signet has clarified that these charges totaled $63,600 and were approved by this Court as <u>custodia</u> <u>legis</u> expenses on October 27, 2011. (D.E. 77). Although this sum was to be paid to Signet, it has declared that it was reimbursed the entire $63,600 by Kiewit.[3] (D.E. 110, at 2). Hence, the $73,140 now claimed by Kiewit includes the $63,600 paid to Signet plus a fifteen percent mark-up charge to KTM according to the contractual rate schedule for obtaining third party services. (D.E. 108-2, at 12).

In light of the previously granted <u>custodia</u> <u>legis</u> expenses for the use of Signet's tugboats, it is respectfully recommended that the $63,600 in expenses be paid to Kiewit instead of Signet following the sale of the Atlas Century. These expenses do not include the remaining fifteen percent mark-up charge that was to be billed to KTM. Such a charge is more properly recoverable as contractual damages rather than the higher-priority <u>custodia</u> <u>legis</u> expenses because it is essentially a profit that solely inures to Kiewit's benefit.

---

[3] To the extent that Signet indicated that it intends to file an amended pleading to reflect the impact of this transaction on its claims, it must file a separate motion to that effect.

### D. Kiewit Has Not Demonstrated That All The Dockage Fees Are Custodia Legis Expenses.

For the entire duration of this litigation, the Atlas Century has been docked at Kiewit's Ingleside facility. Kiewit calculates that it is owed $620,000 in accrued docking fees at the contractual rate of $2,000 per day, a sum that represents the rig's stay at the facility from the time of its arrival through April 6, 2012. (D.E. 108, at 2). The claimed $620,000 in dockage fees eclipses the $328,500 total KTM purportedly owes to Kiewit for all of the other work pursuant to the underlying contract. (D.E. 108-2, at 1, 8).

Wharfage expenses have long been regarded as reimbursable costs incurred in custodia legis. The Poznan, 274 U.S. at 123; accord Beauregard, Inc., 107 F.3d at 354 (quoting The Poznan). Typically, the plaintiff as the party petitioning for a vessel's arrest will advance the cost of keeping the vessel in custody to the Marshals as a condition of attachment. See generally Araya v. McLelland, 525 F.2d 1194 (5th Cir. 1976). This practice is further supported by 28 U.S.C. § 1921(a)(1)(E), which directs the Marshals to collect fees for "[t]he keeping of attached property (including boats, vessels, or other property attached or libeled)," as well as 28 U.S.C. § 1921(a)(2), which requires the party seeking attachment to advance "a deposit to cover the initial expenses ... and periodically thereafter such amounts as may be necessary to pay such expenses until the litigation is concluded."

Neither the Marshals nor Plaintiff have apparently paid Kiewit for the cost of docking the Atlas Century at its facility. In The Poznan, the Supreme Court held that the owner of a private pier was entitled to recover the reasonable value of the wharfage services provided as custodia legis expenses. 274 U.S. at 123. Although a claimant objected to the amount awarded as being unreasonable, the court found that this issue of fact was fairly tried and the district court's ruling

13

was supported by the evidence.  Id.

Here, however, there is insufficient evidence to support granting Kiewit's requested motion to include docking fees as custodia legis expenses.  Without more information from Kiewit regarding the reasonableness of a $2,000 per day dockage charge, it has failed to carry its burden of proving that it is equitably entitled to $620,000 in aggregate docking costs.  Although Kiewit and KTM may have negotiated to the per diem rate at arms length, neither party envisioned that the Atlas Century would be detained at the dock for almost a year of litigation.  As such, it is not clear that applying what may have been intended to be a short-term dockage rate would be equitable when it may prejudice the recovery of the remaining creditors.

Intervenor COSCO specifically challenges the $2,000 per diem charge as being unreasonable and excessive.  (D.E. 111, at 4).  It cites to litigation at the Galveston Division involving the Atlas Century's sister vessel, the Viking Prospector.  In that action, the Court adopted a recommendation to sell the vessel on the basis that the $2,500 per diem cost of keeping the rig under arrest at a shipyard was disproportionate to the liquidation value of the vessel, which was estimated at $1 million dollars.  Gulf Copper & Mfg. Corp. v. Rig Viking Prospector, No. G-11-132 (S.D. Tex.), (D.E. 50, 57).  COSCO also references Freret Marine Supply v. M/V Enchanted Capri, in which the court explained that it had ordered the subject vessel sold because the $1,500 per day cost of maintaining custody over a cruise ship worth around $12 million dollars was excessive.  No. CIV. A. 00-3805, 2001 WL 649764, at *2-3 (E.D. La. June 11, 2011) (unpublished).  While these cases were not dealing with whether the purported expenses incurred was excessive for custodia legis purposes, they establish that the continued accrual of four-digit per diem dockage fees for large vessels are not assumed to be

customary as a matter of course.

Moreover, even if the $2,000 per diem docking fees are not excessive, Kiewit has failed to distinguish and designate the portion of the docking charges that are more properly recoverable in contract. It is undisputed that the Atlas Century was to remain at Kiewit's facility until it was ready to be loaded onto Xiang Yun Kou heavy lift vessel. Despite the Marshals' arrest of the rig only days after arrival, Kiewit continued to perform services in accordance with the contract. At some point, however, it became clear to Kiewit that KTM was not going to perform their end of the bargain. Only past this unknown point can Kiewit justifiably claim that permitting the Atlas Century to remain at their dock created a benefit that inured to all claimants. To allow all docking fees to be included as custodia legis expenses, including the time during which the dockage services were provided pursuant to contract, would be to permit Kiewit to obtain its contractual damages at a higher priority than the remaining creditors. It would also allow Kiewit to forego whatever obligations it would have had to mitigate its contractual damages.

In the absence of evidence tending to show that the entire $620,000 in dockage fees claimed by Kiewit is reasonable, it is respectfully recommended that such an award for custodia legis expenses not be granted. Any further attempt to recover docking fees as custodia legis expenses must be accompanied by sufficient evidence regarding the standard costs for long-term docking of a vessel comparable to the Atlas Century as well as a showing concerning when the docking charges began to accrue as custodia legis expenses. All remaining docking fees may be recoverable only in contract.

## IV.  RECOMMENDATION

The recovery of <u>custodia</u> <u>legis</u> expenses is the means by which parties are reimbursed for trying to protect the vessel until its sale.  It does not present an opportunity for individual claimants to obtain recovery for their underlying claims.  Based on the foregoing reasons, it is therefore respectfully recommended that Intervenor Kiewit's motion for reimbursement of <u>custodial</u> <u>legis</u> expenses, (D.E. 108), be granted only as to the $63,600 it paid to Signet for the tugboat services and denied as to the remainder.

Respectfully submitted this 15th day of May 2012.

_____
BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1); Rule 72(b) of the Federal Rules of Civil Procedure; Rule 8(b) of the Rules Governing § 2254 Cases; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).